**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | | |
|---|---|---|
| ANDREW PAQUETTE, | ) | CIVIL RIGHTS COMPLAINT |
| PLAINTIFF, | ) | 42 U.S.C. §1983 |
| | ) | |
| V. | ) | CIVIL NO. <u>05-40099FDS</u> |
| | ) | |
| NASHOBA REGIONAL SCHOOL | ) | |
| DISTRICT; | ) | |
| MELANSON, HEATH AND COMPANY; | ) | **MEMORANDUM OF LAW IN** |
| JOHANNA VAN HOUTEN RILEY, in her | ) | **OPPOSITION TO THE MOTION OF** |
| official capacity as the former | ) | **THE DEFENDANTS', NASHOBA** |
| Superintendent for the Nashoba Regional | ) | **REGIONAL DISTRICT,** |
| District and in her individual | ) | **JOHANNA VAN HOUTEN RILEY,** |
| capacity; and | ) | **CARLOS LLANSO, ANNE KINGAN,** |
| CARLOS LLANSO, ANNE KINGAN, | ) | **ALICE ROEMER, MARY BETH YETZ,** |
| ALICE ROEMER, MARY BETH YENTZ, | ) | **LINDA WEATHERBEE,** |
| LINDA WEATHERBEE, ADAM TOCCI, | ) | **ADAM TOCCI, JEANNE WYAND,** |
| JEANNE WYAND, NANCY FLEMING, | ) | **AND NANCY FLEMING, MOTION TO** |
| in their official capacities as former members | ) | **DISMISS** |
| of the Nashoba Regional Committee | ) | |
| and in their individual capacities, | ) | |
| DEFENDANTS. | ) | |

NOW COMES Plaintiff Andrew Paquette, by and through his attorneys, opposes the

motion by the above-listed Defendants, (collectively, "Defendants") to dismiss counts I, II, V,

VII, VIII, IX, X, and XII[1], of the First Amended Verified Complaint.

<u>**INTRODUCTION**</u>

Contrary to the Defendants' assertions in its Memorandum of Law, Paquette was first

hired in 1999 by the Nashoba Regional District ("District") as the Director of Finance and

Operations.  <u>See</u> Plaintiff's Complaint ¶15.  One year later, the District hired Johanna Van

Houten Riley ("Riley") as the Superintendent of Schools for the District.  <u>Id.</u> at ¶ 16.  Soon after

Riley was hired, she requested that Paquette generate financial reports for the Nashoba Regional

---

[1] At times, Defendants have misnumbered the Counts in their Memorandum.  Paquette has carefully cited the numbers for the Counts that the Defendants substantively challenged in their Memorandum of Law.  To the extent that the Defendants intended to challenge other claims, Paquette asserts that such Counts should survive Defendants 12(b)(6) motion as to those Counts.

School Committee ("Committee") that were less detailed than reports required under the previous Superintendent. <u>Id</u>. at ¶¶18-19. In fact, on several occasions, Riley personally instructed Paquette on the manner in which he should alter the District's financial reports. <u>Id</u>. at ¶ 22.

In the Spring of 2002, Paquette informed Riley that the District was facing a deficit of approximately one million dollars and requested that she order a spending freeze for the rest of the school year. <u>Id</u>. at ¶¶23-24. Despite issuing the spending freeze as requested, Riley ultimately authorized another one million dollars in expenditures for that fiscal year, often forcing the Plaintiff to sign off on them. <u>Id</u>. at ¶24, 25. The Committee also authorized spending. <u>Id</u>. at ¶24.

In light of the impending crisis, Paquette detailed the growing, multi-million dollar in a budget sub-committee meeting in late June of 2002. <u>Id</u>. at ¶27. At that meeting, for which Paquette has information to believe that no public meeting minutes were recorded or maintained, he was accused of criminal activity. <u>Id</u>. at ¶27, 29. Riley and Llanso, who he had previously informed about the financial crisis in a closed meeting, failed to intervene on the attack against Plaintiff, despite their knowledge. <u>Id</u>.

Paquette's immediate reaction upon the allegations of the Committee was to submit his resignation on June 20, 2002. <u>Id</u>. at ¶29. He ultimately stayed his resignation until September 13, 2002 in light of a response by Riley that not only praised his service to the District, but requested he stay his resignation until that date. <u>Id</u>. at ¶¶29, 31. Paquette has not asserted, as the Defendants incorrectly claim in their Memorandum of Law, that Paquette either merely agreed to stay on as an at-will employee for a "transitional period" or that he was no longer an employee after the June 20, 2002 date. (<u>Compare,</u> Compl. at ¶¶29,32 with Def. Memo of Law at pp. 3-4).

Later in August of 2002, Paquette was outside of the country on vacation. Compl. at ¶33. When Paquette returned, he learned that despite his informing Riley and the Committee of the extensive budget deficit before the close of the fiscal year, Riley and Roemer (the District Treasurer) publicly claimed that they had discovered an extensive budget deficit. Id. at ¶¶33, 39. They publicly placed the blame solely on Paquette and did not apprise the public of how they really learned about the District's financials. Id.

Paquette also met with Riley on August 16, 2002, who asked him to return the District's property and told him "it would be in the best interest of the District and you if we ended our relationship effective immediately." Id, at ¶35. At that time, she offered to continue Paquette's pay and compensation for a three week period through September 13, 2002 and to write him a letter of recommendation. Id. She did not state his employment status to him at the time, but later publicly stated that he was on "administrative leave". Id.

At this same meeting, Riley also informed Paquette that the District hired Melanson, Health & Company ("MHC") to review the District's financial records. Id. at ¶36. The District apparently contracted with MHC to perform this audit for $60,000.00, at the time when the District "revealed" the financial crisis to the public. Id. at ¶33, 100. Riley requested Paquette's help in the investigation. Id. at ¶36. After this meeting, Paquette was escorted off the property by the Assistant Superintendent in view of the public and at the direction of Riley. Id at ¶37.

Pursuant to his employer's request, Paquette spoke with MHC accountants on August 19, 2002 to assist in the internal audit of the financial records. Id. at ¶38. Noone from the District ever told Paquette that a criminal investigation had been convened regarding the District's finances at the time he helped with the internal audit. Id. In fact, Paquette only learned of the

criminal investigation in late August of 2002 when a *Worcester Telegram and Gazette* article reported that the District called the criminal authorities.  Id. at 39.

On or about August 30, 2002, the District approached Paquette a second time requesting that he participate in the financial audit.  Id. at ¶42. However, as he was now aware of the pending criminal investigation, he requested that he receive questions in advance and be allowed to consult with an attorney. Id. at 44.  Riley refused these requests.  Id.

In its continued efforts to coerce Paquette to comply with its internal investigation, Riley threatened to impose discipline in a September 11, 2002 letter if Paquette did not cooperate with the District's financial crisis.  Id. at ¶ 45.  As threatened, the District imposed discipline when it unlawfully withheld his compensation in the amount of approximately $3000.00 for the period of September 1, 2002 to September 13, 2002.  Id. at ¶¶47, 70.  A letter dated September 16, 2002 from the District's attorney confirmed this form of discipline Id.  at ¶47.  In fact, the District electronically withdrew Paquette's wages from his personal bank account.  Id.  To date, the District has not paid Paquette his $3000.00 in wages, and it only paid him his earned and unused vacation time after a request by his attorney.  Id. at ¶75.

In September of 2002, the Nashoba Regional District again attempted to coerce Paquette to participate in its internal investigation, this time by compelling his sworn testimony in the internal audit by filing a Complaint in the Massachusetts Superior Court.  Id. at ¶59.  At all relevant times, the criminal investigation requested by and initiated by the District remained on-going.  Id. At no time did the District indicate or offer that if Paquette answered questions he would be immune from having the statements he made in the internal investigation be used against him in the pending criminal investigation. Id. at ¶59.

In addition to the above, at the time the District came out publicly about the financial crisis and at all relevant times thereafter, the Defendants made numerous false publications against Paquette to the press and at public meetings attended by hundreds of people including, among other things, false statements about Paquette's job performance, false statements that the Plaintiff engaged in unethical accounting practices, false statements implicating that the Plaintiff had engaged in criminal activity, including forgery, and statements implying that Paquette was solely responsible for the financial crisis at the District. Id. at ¶¶42, 49, 50, 51, Counts V & VII. At no time did any of the Defendants, all of whom had knowledge that these statements were false, make any attempt to publicly correct these statements. Id. at ¶¶52, Counts V & VII. In fact, many of these statements were made as part of a united front with MHC's principal, John Sullivan, who, on information and belief, was hired by the District in order to help defame and publicly point the finger at Paquette for the financial crisis. Id. at Count VI.

During this period of time in which false statements were being made by the Defendants and adverse employment actions were being taken against Paquette, Paquette requested information regarding the nature of his employment and the actions taken against him. Id. at ¶66. No explanation was provided. Id. Furthermore, the Defendants did not allow Paquette to present his position before any final action was taken against him and they failed to comply with Paquette's request for an adequate name-clearing opportunity, which was presented to the District by way of a letter dated September 25, 2002. Id. at ¶¶66, 67.

## **ARGUMENT**

### I. **A RULE 12(B)(C) MOTION TO DISMISS IS ONLY GRANTED IN THE RAREST OF OCCASIONS, NOT PRESENT HERE**

The Defendants moved to dismiss counts I, II and V (as to Nashoba Regional District ("NRSD")), VII (as to NRSD), and IX, XII, VIII, VI, X, XI (as to Defendants) of the First

5

Amended Verified Complaint for failure to state a claim. In so moving, the Defendants face a particularly heavy burden: a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests only the legal sufficiency of the complaint, not the strength of a plaintiff's proof. <u>Canney v. City of Chealsea</u>, 945 F. Supp. 58, 63 (D. Mass. 1996), quoting, <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974). In asserting a motion to dismiss, the Court must take all allegations contained in the complaint as true and must draw all reasonable inferences in favor of the non-moving party. <u>Lecrenski Bros. v. Johnson</u>, 312 F. Supp. 2d 117 (D. Mass, 2004), quoting, <u>Albright v. Oliver</u>, 510 U.S. 266, 268 (1994). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." <u>Canney</u>, 955 F. Supp. at 63, quoting, <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957) (citations omitted).

The crucial inquiry on a motion to dismiss is whether, based on the allegations of the complaint at issue, the plaintiff is entitled to offer evidence in support of his claims. <u>Siniscalchi v. Shop-Rile Supermarkets, Inc.</u>, 903 F. Supp. 182, 186 (D. Mass. 1995) (citing <u>Scheuer</u>, 416 U.S. at 236). If the complaint is sufficient to state a cause of action in accordance with the law under any theory, the court must deny a motion to dismiss. <u>Wehringer v. Powers & Hall, P.C.</u>, 874 F. Supp. 425, 427 (D. Mass. 1995) (quoting <u>Knight v. Mills</u>, 836 F. 2d 659, 665 [1[st] Cir. 1987]).

**A.    <u>COUNT I MAKES OUT A CLAIM FOR AN ACTIONABLE DEPRIVATION OF HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION</u>**

**1.    Plaintiffs' Claim Falls Squarely Within Existing Precedent**

The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Public employees are entitled, like all other persons, to the benefit of the Constitution, including the privilege against self-incrimination. <u>See</u>

generally, Lefkowitz v. Cunningham, 431 U.S. 801 (1977); Uniformed Sanitation Men Ass'n, Inc. v. Comm'r of Sanitation, 392 U.S. 280 (1968); Gardner v. Broderick, 392 U.S. 273 (1968); Garrity v. New Jersey, 385 U.S. 493 (1967). In addition, public employees subject themselves to dismissal if they refuse to account for their performance of their public trust, *after proper proceedings*, which do not involve an attempt to coerce them to relinquish their constitutional rights. Uniformed Sanitation Men, 392 U.S. at 284-85.

Uniformed Sanitation Men, cited above, is instructive to Paquette's situation. There, the Supreme Court held that it was proper to hold that a deprivation of the plaintiffs' fifth-amendment right to self-incrimination existed where public employees were dismissed for refusing to testify in a disciplinary proceeding on grounds of self-incrimination, when an on-going outside criminal investigation existed, and the questions asked could be incriminating. Id. According to the Court, "Public employees are entitled to remain silent when it is clear that their public employer is seeking, not merely an accounting of their use or abuse of their public trust, but testimony from their own lips which, despite the constitutional prohibition, can be used to prosecute them criminally." Id. at 284.

Stating analogous facts, Paquette has properly pled a cause of action for deprivation of his fifth-amendment right to be free from self-incrimination that falls comfortably within the confines of the precedent of the Supreme Court and this Circuit. He has alleged that during the course of his employment with the District, he was asked to participate in an internal investigation regarding the District's financial crisis. See Compl. at ¶¶36, 42, 45, 47,59. He has alleged that in the course of participating in this investigation he learned through the press that District officials, specifically Riley, had contacted the authorities and initiated a criminal complaint against him. Id. at ¶39. Riley did this at a time when she, the Committee members,

and MHC were not only attempting to point the finger at Paquette for the financial crisis, but were also publicly alleging that he engaged in criminal wrongdoing. <u>Id</u>. at Count VII. Paquette has also alleged that the Defendants, after placing him on what they later characterized as "administrative leave", attempted to coerce him to relinquish his right against self-incrimination by stating that they would "impose discipline" on him by withholding his wages, which they actually did withhold. <u>Id</u>. at ¶¶45,47,70. At no time did the Defendants, despite their initiation of the on-going criminal investigation against Paquette, offer to keep the statements he made in the internal investigation immune from use in any criminal proceedings against him, and they went so far as to refuse Paquette's reasonable request that he either receive the questions in advance or be allowed to have his attorney present; instead attempting to compel his sworn testimony through Court action. <u>Id</u>. at ¶59. Based on the Defendants' course of conduct, it can be inferred that Paquette had every reason to believe that any statements he made in the investigation would be provided to the criminal investigators and used against him in a subsequent criminal proceeding and, as such, the failure of the Defendants to provide him with immunity was a violation of his fifth-amendment rights. <u>Lecrenski Bros. v. Johnson</u>, 312 F. Supp. 2d 117 (D. Mass. 2004), quoting <u>Albright v. Oliver</u>, 510 US 266, 268 (1994) (in assessing a motion to dismiss, all allegations in the complaint must be taken as true and all reasonable inferences in favor of the non-moving party must be drawn).

### 2. Defendants Reliance on <u>Chavez v. Martinez</u> is Misplaced

In their brief, the Defendants' argue that <u>Chavez v. Martinez</u>, 538 U.S. 760 (2003) stands for the proposition that, because Paquette was not criminally prosecuted, his Fifth Amendment right against self-incrimination is not implicated and that, because of this, even if all the facts Paquette alleges are true, his Complaint cannot survive. However, the Defendants' interpretation

of this case is elementary and fails to account for how <u>Chavez</u> actually distinguished the facts contained therein from cases involving public employers.

First, <u>Chavez. V. Martinez</u> is not factually similar.  Chavez, the petitioner, was not a public employee who was disciplined for refusing to testify during an internal investigation on grounds of self-incrimination where there was an on-going outside criminal investigation, as is the case with Paquette.    Rather, Chavez was an individual who, after a shoot-out with police, was interrogated by a patrol supervisor while being treated for gunshot wounds and who admitted to police during the investigation that he used heroine and had taken a police officer's gun during the incident.  <u>Id</u>. at 764-65. He was never charged with a crime, no criminal proceedings ever commenced, and he was never convicted.  <u>Id</u>. at 989.  His claim was that the failure of the police to provide him with a Miranda warning violated his fifth-amendment rights.

Second, Justice Thomas was careful in his opinion to distinguish the line of cases which have held public employees cannot be coerced into making self-incriminating statements against themselves in disciplinary hearings from <u>Chavez</u> and, accordingly, he did not disturb these prior cases' holdings.  <u>Id</u>.  Whether characterized as a prophylactic rule or a core right, the reality is, as Justice Thomas so adeptly pointed out: "the government may not, however, penalize public employees and government contractors to induce them to waive their immunity from the use of their compelled statements in subsequent criminal proceedings.  <u>Id</u>. at n. 2.    When this happens, the Federal Courts have routinely held that such coercion violates the Fifth Amendment.

In sum, "the natural concern which underlies [these] decisions is that an inability to protect the right at one stage of a proceeding may make its invocation useless at a later stage. <u>Michigan v. Tucker</u>, 417 U.S. 443, 440-41 (1974).  Defendants have cited no case law and presented no arguments that should persuade this court to stray from a long line of cases

involving the Fifth Amendment protection of public employees and, as such, Paquettes' §1983

claim alleging a Fifth Amendment deprivation should survive this motion.

**B.     IN COUNT II THE PLAINTIFF HAS PROPERLY PLEAD A CLAIM FOR AN ACTIONABLE DEPRIVATION OF HIS RIGHT TO DUE PROCESS**

**1.     Contrary to Defendants Inappropriate Mischaracterization of the Facts, Plaintiff Was Employed By the District When the Alleged Deprivation Occurred**

The Defendants make the preposterous assertion that Mr. Pauqette "has not alleged, nor

can he prove that he had a legitimate expectation of continued employment after his resignation

was accepted on June 26, 2002." See Def. Memo of Law at p. 8. In doing so, the Defendants

have completely ignored the hallmark of a 12(b) motion to dismiss, in which a court will not

dismiss an action unless, after taking all the well-pleaded facts in the light most favorable to the

non-moving party, the Court can find no set of circumstances entitling the claimant to relief.

Lecrenski Bros. v. Johnson, 312 F. Supp. 2d 117 (D. Mass. 2004), quoting Albright v. Oliver,

510 US 266, 268 (1994) (in assessing a motion to dismiss, all allegations in the complaint must

be taken as true and all reasonable inferences in favor of the non-moving party must be drawn);

Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  To be sure, Paquette has alleged that he did

submit a resignation on June 20, 2002.  Compl. at ¶29.  However, this is the beginning of the

story, not the end as the Defendants would like to characterize it.  Riley affirmatively requested,

by letter dated June 26, 2002, that Paquette stay he resignation until September 13, 2002.  Id. at

¶¶29,31.  Paquette accepted her offer.  Id. Thus, Paquette remained a District employee who

enjoyed a legitimate expectation of continued employment with the District up and until

September 13, 2002 and was, therefore, a public employee with a property right to employment.

**2.     Even if Paquette was Arguably an At-Will Employee, He Has Alleged An Appropriate Violation of His Liberty Interest**

Furthermore, in their Memorandum the Defendants attempt to argue that Paquette was, at most, an at-will employee and therefore did not have a legally cognizable property interest after his termination. <u>See</u> Def. Memo of Law at p. 8. However, even if the Court were to agree with the Defendants theory that Paquette is an at-will employee, the reality is that even at-will public employees enjoy certain liberty interests that are protected by the 14th Amendment, which Paquette has adequately alleged.

Although the general rule is that a public employee does not have a protected interest in continued employment that obligates a governmental employer to provide a hearing, an exception exists in cases where an employee is terminated in connection with publicized allegations of illegal or improper conduct. <u>See</u> <u>e.g.</u>, <u>Bishop v. Wood, 426 U.S. 341 (2002)</u>. In order to successfully establish a claim for the deprivation of a liberty interest without due process, five elements must be satisfied:

> "First, the alleged statements must level a "charge against [the employee] that might seriously damage his standing and associations in his community" and place his "good name, reputation**,** honor, or integrity . . . at stake." Statements merely indicating the employee's improper or inadequate performance, incompetence, or neglect of duty are not sufficiently serious to trigger the liberty interest protected by the Constitution. Second, the employee must dispute the charges made against him as false. Third, the stigmatizing statements or charges must have been intentionally publicized by the government. That is, the defamatory charges must have been aired "in a formal setting (and not merely the result of unauthorized 'leaks')." Fourth, the stigmatizing statements must have been made in conjunction with an alteration of the employee's legal status, such as the termination of his employment. Finally, the government must have failed to comply with the employee's request for an adequate name-clearing opportunity. The purpose of the hearing is only to allow the employee to clear his name of the false charges; compliance with formal procedures is not necessarily required." <u>Wojcik v. Mass. State Lottery Comm'n</u>, 300 F.3d 92 (2002) (citations omitted).

There is simply no question that looking at the face of Paquette's Complaint under the 12(b)(6) standards, that he has alleged sufficient facts, even if the Court were to conclude he is

an at-will employee, to survive a motion to dismiss.  Specifically, Paquette has adequately alleged that he expected to be employed until September 13, 2002, but that he was terminated and denied his wages for the period of September 1, 2002 through September 13, 2002.  Compl. at ¶¶ 29-32; 65.  Furthermore, he has alleged that at the time of his discharge and thereafter, the Committee Defendants made false statements at public meetings attended by hundreds of people, including accusations that he acted unethically and criminally in his position for the District, which have seriously damaged his good name, reputation, honor and integrity in the community. Id. at ¶¶ 42, 49, 50, 51; See also Counts V and VII.  Furthermore, he has alleged that, despite his letters to the District requesting information regarding the nature of his employment and the actions taken, he was not provided such an opportunity and his September 25, 2005 letter to the District's attorney, in which he requested a name-clearing hearing, was also denied.  Id. at ¶ 67.

### 3.    The Individual School Committee Defendants are Proper Defendants

In arguing that the individual School Committee defendants cannot, as a matter of law, be defendants in Count II, the Defendants mischaracterize the nature of the individual liability in the §1983 claim.  To be sure, the right to hire and fire employees of the District that work in more than one school rests with the Superintendent under M.G.L. c. 71, §42.  However, just because the superintendent has the authority under the statute to hire/fire does not mean that the individual school committee defendants cannot be sued.  The law in this jurisdiction is clear that a government official can be held liable under §1983 for the behavior of his or her subordinates if "(1) the behavior of such subordinates results in a constitutional violation and (2) the official's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or gross negligence amounting to deliberate indifference." Chapin v. University of Massachusetts, 977 F. Supp. 72,

80 (1997).  An important factor in making the determination of liability is whether the official was put on some kind of notice of the alleged violations.  Once an official is so notified, *either actually or constructively*, it is reasonable to infer that the failure to take such steps, as well as the actual taking of them constitutes a choice from among various alternatives.  Id.

Paquette has adequately alleged that a deprivation of his due process rights was effectuated. See Compl. at Count II.  In addition, he has alleged sufficient facts from which it can be inferred that the individual school committee members "encouraged, condoned, and acquiescenced" Riley's conduct that amounted to deliberate indifference.  In fact, there is ample evidence in the Complaint, which must be taken as true, that the individual school committee members who, (as a school committee, had statutorily prescribed oversight) had actual or constructive notice of the employment actions that were being taken against Paquette.  See e.g. MG. 1 c. 71, Secs. 37, 42, 59 (granting duty of oversight of Superintendent and policy making function to school Committee).  Not only did the District have its own attorney send notice of the adverse employment actions to Paquette, but as the Complaint makes clear, the individual defendants actually made false statements imputing criminal and unethical behavior to Paquette. Id. at ¶¶ 47, 49, 50, 51, Count V and VII.  Thus, these individuals who were charged with oversight over Riley and a duty to the District could have directed her to stop her actions at any time and, in having notice of the facts, had the ability and wherewithal to make the deprivations stop.  Because the individual school committee Defendants are proper Parties to this action and at this stage of the litigation, these individuals school committee defendants cannot show that Paquette will not be successful under any legal theory based on the facts averred in his Complaint, Count II as to the individually named Defendants should survive.  See Wehringer v. Powers & Hall, P.C., 874 F. Supp. 425, 427 (D. Mass. 1995) (citations omitted).

C.    **IN COUNTS I AND II, THE PLAINTIFF HAS PROPERLY ALLEGED A PRIMA FACIE CASE OF GOVERNMENTAL LIABILITY UNDER 42 U.S.C. §1983**

1.    **Requirements for Pleading a §1983 Claim**

In order to establish governmental liability, a District is only liable under §1983 if it has caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dept of Social Services of City of NY, 436 US 658, 690 (1978). Furthermore, governmental liability cannot be based on a theory of respondent superior under 42 U.S.C. § 1983. It attaches "only if it is proven that the unconstitutional conduct of its employees implements or executes a municipal policy or custom." Gonsalves v. City of New Bedford, 939 F. Supp. 915, 916 (D.Mass. 1996) (citing Monell at 694 (1978)). As explained in Gonsalves, "this means that the actions of subordinate officials alone cannot create [governmental] liability. Rather, the [government entity] is potentially liable only for the conduct of its final policymaker or policymakers concerning the conduct in question." Id.

2.    **Counts I and II Properly Allege A School District Policy Or Custom**

Without providing any reasoning or examples, the Defendants' assert that Paquette, "has not alleged and cannot prove that a policy or custom of NRSD was a substantial motivating factor in causing the constitutional deprivations alleged in the Complaint." Def. Memo of Law at p. 10. However, it is clear that this is not the case. As explained in the previous section, Paquette alleges in both Counts I and II that the official policymakers of the District, specifically Riley and the School Committee, engaged in a course of action which resulted in a violation of his 5th and 14th amendment rights and included, among other things, his dismissal prior to September 13, 2002, the deprivation of his wages, and false statements made by District officials imputing unethical and criminal activity to Paquette. He has also alleged throughout his Complaint that these actions were not only taken independently by these policymakers, but

collectively by these policymakers who all had full knowledge of the facts. Id. at 71, 99-107.[2] It is disingenuous for the Defendants to infer that the mere fact that the complainant did not label the actions taken by the defendants as a "policy" and label these individuals as "policymakers" in the Complaint somehow means the Complaint is insufficient.  Plaintiff appropriately alleges in the Complaint a myriad of decisions that these individuals arguably made or acquiesced to through their deliberately indifference. See generally, Id. at Counts I & II.  As stated previously, the Massachusetts Education Reform Act of 1993, M.G.L. c. 71, et seq. makes it clear that the Committee and the Superintendent are charged with the official policymaking functions of the school.  The consequences of Defendants' logic, if it were to be accepted, is that every government entity could escape liability under §1983 by simply claiming that each of the allegedly impermissible acts of its policymakers was not pursuant to policy because the Plaintiff did not plead specific words in the Complaint.[3]  However, it remains for a jury to determine whether the decisions of the policymakers have caused the deprivation of rights at issue.

**D.    COUNT VIII[4] OF THE PLAINTIFF'S COMPLAINT PROPERLY ALLEGES A CLAIM AGAINST DEFEDANTS UNDER THE DISTRICT MASSACHUSETTS CIVIL RIGHTS ACT**

**1.    "Threats, Intimidation or Coercion" Includes "Economic Coercion**

The Massachusetts Civil Rights Act provides a civil remedy to a plaintiff who proves that his or her federal or state constitutional rights or rights under federal or state law have been

---

[2] Although it is not central to the reasoning of this Memorandum of Law, it should not be lost on this Court that at all times the Defendants who had initiated the criminal investigation against Paquette were acting on the advice of counsel.  This is not a case of public officials who had no reason to know of the rights and privileges their public employees enjoy.

[3] Defendant understands that a decision over whether an individual person is a policymaker is a determination for the Court, not the jury.  However, this assertion is typically made in a motion for summary judgment where the parties have had an opportunity to provide the Court with sufficient information, after discovery, before submitting the claim to a jury.

[4] The Defendants' Memorandum of Law mistakenly cites Count IX as arguing  a claim against all defendants under the Massachusetts Civil Rights Act, M.G.L. c. 12, §11I and for invasion of privacy.  (See. Defend. Memo of Law, ¶¶E ,F).   However, it is actually Count VIII of the Complaint that states a Massachusetts Civil Rights Claim and Count IX only states a breach of a right to privacy claim under M.G.L. c. 214, Sec. 1B.

interfered with by "threats, intimidation or coercion." Bally v. Northeastern University, 403 Mass. 713, 719 (1989). To prevail on a claim under the Act, a plaintiff must prove three elements: that 1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or the Commonwealth 2) has been interfered with, or attempted to be interfered with, and 3) that the interference or attempted interference was by "threats, intimidation, or coercion". Id.

Contrary to the Defendants' assertions, the Plaintiff has alleged a cognizable deprivation of his Fifth Amendment right to remain silent, as well as, a deprivation of his protected property interest in continued employment and wages, the basis for which is laid out in greater detail in Section II (B)(2) of this brief. Furthermore, the Defendants incorrectly assert that the Complaint does not adequately allege that the defendants interfered, or attempted to interfere with his rights by threats, intimidation and coercion.

According to the Defendants, under Massachusetts law "threats, intimidation and coercion" must involve an element of physical confrontation and, absent such a confrontation, a plaintiffs' claim must fail. See Def. Memo of Law, p. 13. However, this is not the case. Although it is true that Massachusetts case law supports the contention that "threats" and "intimidation" must involve proof of physical harm or a confrontation that involves physical harm, the Supreme Judicial Court has recently rejected the physical harm limitation of applies to "coercion" by holding that economic coercion can be sufficient under the act. Buster v. Moore, 438 Mass. 635 (2003).

Under the liberal pleading requirements, Paquette has alleged sufficient facts in order to make out a claim under M.G.L. c. 12, §11I. Specifically, as to the first two elements he has alleged that through a specific course of conduct the Defendants attempted to or did deprive him

of his right to be free from self-incrimination and his property interest in continued employment in violation of the 5th and 14th amendments. In addition, he has argued that the Defendants' interfered or attempted to interfere with these rights by depriving him of his wages, first by threatening to withhold his wages as discipline and, secondly by actually effectuating an electronic withdrawal of money from his bank account. Id. at ¶¶ 45, 47, 70. Although the Defendants are free to disagree with the facts alleged in the Complaint and challenge the factual assertions at trial, there is no basis for the Defendants to argue that the Complaint is insufficient at this stage of the litigation.

**E.    THE PLAINTIFF HAS APPROPRIATELY PLED A CLAIM FOR VIOLATION OF HIS RIGHT TO PRIVACY AND, ACCORDINGLY COUNT IX OF THE COMPLAINT SHOULD SURVIVE**

**1.    Requirements for Pleading A Right to Privacy Claim**

Under Massachusetts law, "a person shall have a right against unreasonable, substantial or serious interference with his privacy" M.G.L. c. 214, §1B. In order to establish liability for an invasion of privacy, a plaintiff must allege and prove that the defendant unreasonably, substantially and seriously interfered with his privacy by disclosing facts of a highly personal or intimate nature and that defendant had no legitimate reason for doing so. See Martinez v. New England Medical Center, 307 F. Supp.2d 257 (D. Mass. 2004). "In the employment context, "[i]n determining whether there is a violation of § 1B, it is necessary to balance the employer's legitimate business interest in obtaining *and publishing* the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure" This principle applies to public as well as private employment. Gauthier v. Police Comm'r of Boston, 408 Mass. 335 (1990) (citations omitted).

In their brief, the Defendants' cite to <u>Pottle v. School Committee of Braintree</u>, 395 Mass. 861, 866 (1985) and argue that Paquette was a public employee and a public figure[5] and, therefore, had a diminished expectation of privacy. Despite the fact that <u>Pottle</u> was not a case involving issues of M.G.L. 214, §1B, to the extent that the case is instructive, it is important to recognize that simply because a public employee may have a diminished right to privacy, does not mean that that right to privacy is entirely abrogated. Much information contained in a personnel record, including disciplinary actions, have been held to constitute private information under Massachusetts law. <u>See</u>, <u>e.g.</u> <u>Wakefield Teachers v. Wakefield</u>, 431 Mass. 792 (2002).

It is also important to note that when bringing a Massachusetts state law claim in Federal Court, the Federal pleading standards apply. <u>See</u> <u>Andreson v. Diorio</u>, 349 F. 3d 8, 19-20 (2003). Even if Massachusetts courts require a claimant to plead with specificity a violation under the Massachusetts privacy statute, this is not the case in Federal Court. Fed. R. Civ. P. 8(a)(2). ( a short and plain statement of facts is all that is required). This statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957). Accordingly, although the Defendants have proffered an argument as to why the information alleged in the Complaint weighs favor of dissemination in the public interest, Mr. Pauqette had no affirmative duty to plead why he believes the interest weighs in his favor.

**F.    <u>COUNT X FOR TERMINATION IN VIOLATION OF PUBLIC POLICY SHOULD SURVIVE</u>**

In its attempt to attack Paquette's Motion to Dismiss on the basis that he has not alleged a case of wrongful termination, the Defendants have either misread or mischaracterized the

---

[5] It should be noted that although the Plaintiff accepts the contention that Paquette was a public employee, he does not accept the Defendants' characterization of him as a public figure or a public official.

allegations in the Complaint.  Specifically, Paquette does not allege that after he resigned he was working without an express employment contract; he states that after June 26, 2001, a year before his letter of resignation, he was working without an express, written  employment contract because neither the Interim Superintendent nor Riley ever renewed or renegotiated his contract. See, Compl. ¶¶125-125.  Because Paquette is cognizant that that a determination of the terms and conditions of his employment after he agreed to remain with the District until September 13, 2002 will likely involve a factual determination, he was careful to advance alternative theories in his Complaint, as allowed for under the rules.  Fed.R.Civ.P. 8(c)(2).  In addition, nowhere in the Complaint does Paquette allege that he was terminated on June 26, 2002, as the Defendants erroneously maintain.  See Def. Memo of Law at ¶ 16.

1.    **Standard**

The public policy exception to the termination of at-will employees is narrow, but it has received recognition in Massachusetts. See King v. Driscoll, 418 Mass. 576, 582, 638 N.E.2d 488 (1994) (citations omitted).  It may be a violation of public policy to terminate an employee for asserting a legally guaranteed right, for doing what the law requires, or refusing to do that which the law forbids.  Smith v. Pfeiffer v. Superintendent of Walter Fernand School, 404 Mass. 145, 149-50 (1989).  Moreover, Massachusetts case law has stated that "it may be a violation of public policy to terminate an employee who is doing what the law encourages, even if the activity is not specifically required by law . . ." Flesner v. Technical Comm. Corp., 410 Mass. 805, 810 (1991).

2.    **Nothing Under Massachusetts law Requires That the Termination and The Public Deed Be Contemporaneous**

Defendants' incorrectly assert that Paquette's claim must fail because he does not allege, nor can he prove, that he was terminated for providing information regarding the budget. Def.

Memo of Law at p. 15. They also incorrectly assert that because Van Houten asked Paquette to remain in the School District's employ after his resignation, that he has not stated a viable claim. Id.

To be sure, Paquette did not allege the magic words "he was terminated for providing information regarding the budget" in his Complaint. However, the Federal Rules do not require such magic words. See, e.g., Conley v. Gibson, 355 U.S. 41, 47 (1957). In addition, it is true that he does not allege that he was fired contemporaneously with his disclosure of the financial crisis. However, no case law exists that requires such contemporaneous termination. Quite simply, Paquette has alleged specific facts from which it can be inferred that the conduct which occurred after he disclosed the financial crisis, including Riley's request to have him remain in the employ of the District until September 13, 2002, was calculated to terminate him for disclosing this information. Thus, the substance of Paquette's allegations in Paragraphs 124 through 136 make it clear that he is arguing a theory that falls squarely within existing law: that as a direct consequence of his report of the fiscal crisis to the Defendants he was terminated.

### 3.  Contrary to the Defendants Assertion, Paquette Alleged A Deprivation of His Fifth Amendment Rights.

Defendants' repeat the reasoning they gave to this Court for why Paquette's §1983 complaint for violation of his fifth-amendment rights should be dismissed. Def. Memo of Law at p. 16. However, for reasons explained in Section I(A)(2) of this Memorandum, Paquette reasserts that he has properly stated a claim that his Fifth Amendment rights were violated by the defendants that arises under a theory that has been accepted in numerous decisions. In light of the fact that he has claimed that his termination occurred precisely because he asserted his Fifth-Amendment privilege when the district would not grant him immunity for statements he made during the course of his public employment, his Complaint should survive.

4.    **The Individual School Committee Defendants Are Proper Defendants to this Action**

Defendants claim that for all the reasons set forth in Section C(2) of their Memorandum, that the individual school committee defendants cannot be held to have terminated Paquette. However, as School Committee members, each and every one of these individual defendants had the power to effectuate school policy as prescribed by statute and, as each and every one of these individual defendants had either constructive or actual knowledge of the facts leading up to Paquette's termination, they had the authority to take action to try to stop Riley as a matter of law.  See, supra, Section II(B)(3).  Accordingly, Paquette has made out a viable claim against the individual school committee defendants and, as such, the claim against them should survive.

G.    **COUNT IX FOR A VIOLATION OF A RIGHT TO PRIVACY DERIVES FROM STATUTE AND, THEREFORE, IS NOT BARRED BY THE MASSACHUSETTS TORT CLAIMS ACT**

Paquette does not dispute that, pursuant to the Massachusetts Tort Claims Act, that the District cannot be held liable for the common law intentional torts of its agents and employees. However, contrary to Defendants' contentions, Count IX of Paquette's Complaint, which alleges that the Defendants violated Paquette's right to privacy, is not barred by M.G.L. c. 258, Sec. 10(c).  The right to privacy claim asserted by Paquette is a right to privacy that is statutorily based and provides Paquette a remedy against his employer, who is the District.  See M.G.L. c. 214, §1B.  Accordingly, Count IX as to the District should survive.

H.    **COUNT XII FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST THE DEFENDANT IS SUFFIENT TO STATE A CLAIM**

1.    **Requirements for Intentional infliction of Emotional Distress**

There is no doubt that proving a claim of intentional infliction of emotional distress under Massachusetts law is difficult, requiring:

> 1) That the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of [the] conduct; 2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community; 3) that the actions of the defendant were the cause of the plaintiff's distress; and 4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable [person] could be expected to endure it.

Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996) (quoting Agis v. Howard Johnson Co., 371 Mass. 140 (1976)).  Despite the fact that a litigant faces a high burden in ***ultimately*** proving an intentional infliction of emotional distress claim, the law does not require a plaintiff to actually prove all the facts when setting out a claim of intentional infliction of emotional distress.  According to the seminal, Agis v Howard Johnson Co., 371 Mass. 140 (1976)[6], if reasonable men could differ on the issues and a plaintiff has alleged facts and circumstances which reasonably could lead the trier of fact to conclude that defendant's conduct was extreme and outrageous, that "it is for the jury, subject to the control of the court," to determine whether there should be liability. Id. (citations omitted).

To be sure, the standard for extreme and outrageous conduct is a high one that does not encompass simply "workaday insults, annoyances, or even threats and petty oppressions." Conway v. Smerling, 37 Mass. App. Ct. 1, 14 635 N.E.2d 268, 273 (1993). However, it is not an impossible standard to meet.  According to Massachusetts law, extreme and outrageous involves "a high order of reckless ruthlessness or deliberate malevolence." Foley v. Polaroid Corp., 400

---

[6] In Agis, the conduct alleged by the plaintiff was much less severe then the conduct Paquette alleges in his Complaint.  There, the plaintiff's complaint survived a motion to dismiss where she alleged that her supervisor notified all waitresses, including the plaintiff, that there was theft occurring at the restaurant by unknown person(s) and that, until the responsible person(s) were discovered, he would fire all the present waitresses in alphabetical order. Id. After he fired the plaintiff, whose name began with the letter "A", the Plaintiff alleged that she became greatly upset, began to cry, and that she sustained emotional distress, metal anguish, and loss of wages and earnings. Id.  Moreover, she alleged that the defendants knew or should have known that their actions would cause such distress and that the defendants' actions were reckless, extreme, outrageous and intended to cause emotional distress and anguish. Id.

Mass. 82 (1987).  Extreme and outrageous conduct can include many things and certain conduct, which when viewed alone may not constitute outrageous conduct, may do so when viewed in its entirety.  See, e.g., Carvalho v. Town of Westport, 140 F. Supp. 2d 95, 102 (2001) (a series of "affirmative steps to unduly pressure, interrogate, intimidate, and coerce [individuals] into bearing witness against plaintiff in a disciplinary hearing designed to embarrass and harass" is sufficiently outrageous to justify denial of the motion to dismiss);  Johnson v. Teamsters Local 559, 102 F.3d 21, 25 (1st Cir. 1996); Boyle v. Wenk, 378 Mass. 592, 595 (1979) repeated harassment may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress). In conformity with such case law, the circumstances alleged by Paquette, detailed below, are sufficient to form the basis of a intentional infliction of emotional distress claim.

     **2.**     **An application of the standards, compels the conclusion that the intentional infliction of emotional distress claim should survive this Motion**

Andrew Paquette re-alleges and incorporates the substance of the allegations found in the previous 143 paragraphs of his Complaint, rather than regurgitating them verbatim.   In substance, he alleges that after disclosing the growing multi-million dollar financial crisis to the District, Defendants embarked on a course of conduct not only designed to shift the blame away from themselves on onto Paquette, but a course of conduct designed to deny Paquette rights guaranteed under the Constitution and various state statutory and common laws.   They engaged in a course of conduct designed to defame Paquette by knowingly making a series of false statements at public meetings and to the press regarding him. Id. at ¶¶ 42, 49, 50, 51, Counts V and VII.  These false statements and comments expressly and impliedly included false statements concerning Paquette's job performance, false statements that Paquette was to blame for the District's financial crisis, false statements that the Plaintiff engaged in unethical accounting

practices, false statements implicating that the Plaintiff had engaged in criminal activity, false statements that Paquette forged Alice Roemer's signature on purchase orders, and false statements implying that the Plaintiff was solely responsible for the financial crisis at the District.   Moreover, Plaintiff alleges that not only did the Defendants engage in this defamation, but that this defamation was part of a concerted effort by Mr. John Sullivan of MHC and the Defendants to point the finger for the District's financial problems solely at Paquette.  Id. at ¶¶ 101.   Furthermore, Paquette alleges that despite their knowledge to the contrary, Riley and Roemer publicly declared that they discovered the financial crisis when Paquette was away on vacation and, when Paquette returned, the Defendants not only engaged in the alleged defamation, but they did not make him aware that they had initiated a criminal investigation, they attempted to coerce him to participate in the financial audit by threatening to withhold his pay if he did not do so and actually withholding his pay when he asserted his Fifth Amendment right, and by taking adverse employment action against him.

Quite simply, Paquette does not allege that he was merely "insulted, suffered indignity, threats, annoyances, petty oppressions or other trivializes" or that any of the District's actions, alone, constituted extreme and outrageous conduct.  See, e.g., Doyle, 103 F.3d at 195; Foley, 400 Mass. at 99; Restatement (2d) of Torts §46, Commend d; see also, Lamanque v. Mass Dept. of Employ't & Training, 3 F.Supp. 2d 83, 94 (D. Mass. 1998).  He has alleged circumstances that when viewed together; collectively constitute extreme and outrageous conduct that caused severe emotional distress.  (See Compl. at ¶144 repeating and re-alleging the allegations set forth at ¶¶ 1-143).   In addition, Paquette asserts facts throughout the complaint that not only did the defendants know that they were taking these actions, but that they knew or should have known their actions would cause him emotional distress. Thus, the allegations fall comfortably within a

line of cases, which hold that even though the allegations standing alone may not constitute outrageous conduct; they may in fact do so when viewed together.  See Carvalho v. Town of Westport, 140 F. Supp. 2d 95 (2001);  Johnson v. Teamsters Local 559, 102 F.3d 21, 25 (1st Cir. 1996); Boyle v. Wenk, 378 Mass. 592, 595, 392 N.E.2d 1053 (1979).

## **CONCLUSION**

For all the foregoing reasons, the Plaintiff respectfully requests this Honorable Court to deny the Motion to Dismiss.  In the alternative, should this honorable court decide that the pleadings are not sufficient, the Plaintiff respectfully requests that the action not be dismissed and that the Plaintiff be amended leave to amend.

Respectfully submitted,

ANDREW PAQUETTE

By his attorneys

/s/ Layla G. Taylor
Layla G. Taylor, Esq. - BBO No.: 660736
Meghan B. Sullivan, Esq. – BBO No.: 635265
SULLIVAN, HAYES & QUINN
One Monarch Place – Suite 1200
Springfield, MA 01144-1200
Tel. (413) 736-4538
Fax (413) 731-8206
E-mail: lawoffice@sullivanandhayes.com

Dated this 30th day of September 2005.

**CERTIFICATE OF SERVICE**

I hereby certify that on 30th day of September 2005, I electronically filed the Plaintiff's Memorandum of Law in Opposition to the Motion of the Defendants, Nashoba Regional School District et al.'s, to Dismiss the Plaintiff's First Amended Verified Complaint or, in the Alternative for a more Definite Statement with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following registered participants:

William P. Breen, Jr., Esq.
MURPHY, HESSE, TOOMEY &
  LEHANE, LLP
300 Crown Colony Drive, Suite 410
Quincy, MA 02110

Edward D. Shoulkin, Esq.
TAYLOR, DUANE, BARTON &
  GILMAN, LLP
160 Federal Street
Boston, MA 02110

/s/ Layla G. Taylor
Layla G. Taylor, Esq.