## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

)
ANDREW PAQUETTE,                                    )
                                                    )
          Plaintiff,                                )
                                                    )
     v.                                             )
                                                    )
NASHOBA REGIONAL SCHOOL                             )
DISTRICT; MELANSON, HEATH and                       )
COMPANY; JOHANNA VAN HOUTEN                          )     Civil Action No.
RILEY, in her official capacity as the former       )     05-40099-FDS
superintendent for the Nashoba Regional             )
School District and in her individual               )
capacity; and CARLOS LLANSO, ANNE                   )
KINGAN, ALICE ROEMER, MARY BETH                     )
YENTZ, LINDA WEATHERBEE, ADAM                       )
TOCCI, JEANNE WYAND, and NANCY                       )
FLEMING, in their official capacities as            )
former members of the Nashoba Regional              )
School Committee and in their individual            )
capacities,                                         )
                                                    )
          Defendants.                               )
_____)

## MEMORANDUM AND ORDER ON DEFENDANTS'
## MOTIONS TO DISMISS AND FOR A MORE DEFINITE STATEMENT

**SAYLOR, J.**

Plaintiff Andrew Paquette is the former Director of Finance and Operations of the

Nashoba Regional School District.  This case arises out of a series of events following the public

revelation of a financial crisis in the District, which led ultimately to Paquette's resignation and a

criminal investigation into the District's finances.

The complaint asserts twelve counts: (1) an action under 42 U.S.C. § 1983 for violation of

plaintiff's Fifth Amendment privilege against compelled self-incrimination; (2) an action under §

1983 for deprivation of property and liberty without due process; (3) violation of the federal Fair

Labor Standards Act; (4) violation of Massachusetts wage and hour laws; (5) defamation against

the Nashoba Regional School District, Riley, and all named former Nashoba Regional School

Committee members; (6) defamation against the Melanson, Heath & Company ("MH&C"), an

independent accounting firm; (7) civil conspiracy to commit defamation; (8) violation of plaintiff's

privilege against compelled self-incrimination, due process violations, and unlawful withholding of

wages under the Massachusetts Civil Rights Act; (9) violation of plaintiff's statutory right to

privacy under Mass. Gen. Laws ch. 214, § 1B; (10) wrongful termination in violation of public

policy under state common law; (11) in the alternative to Count 10, breach of contract; and (12)

intentional infliction of emotional distress.  Counts 1-5 and 8-11 are asserted against all

defendants other than MH&C.  Counts 7 and 12 are asserted against all defendants, including

MH&C.  Count 6 is asserted against MH&C only.

   Defendants have moved to dismiss various counts for failure to state a claim.  For the

reasons that follow, the Court will dismiss Counts 1 and 8 as to all defendants, and Counts 5, 7, 9,

and 12 as to NRSD only.  Defendant MH&C has also moved in the alternative for a more definite

statement as to Counts 6, 7, and 12, which will be denied.

## I.    **Factual Background**

   The following are the facts as alleged in the plaintiff's complaint.  Although no evidence

has been submitted to the Court, the allegations are assumed to be true for the purposes of

defendants' motions to dismiss.

   The Nashoba Regional School District ("NRSD") hired plaintiff as the Director of Finance

and Operations in August 1999.  One of his responsibilities was to provide thorough financial

reports detailing each school budget line item to the Nashoba Regional School Committee.  A year after plaintiff was hired, the Committee hired defendant Johanna Van Houten Riley as Superintendent of Schools for the District.  Riley was plaintiff's direct supervisor, and was hired, in part, to remedy the District's financial problems—problems that plaintiff contends had existed for some time prior to the hiring of either him or Riley.  Soon after her appointment, Riley instructed plaintiff to begin generating financial reports for the Committee that were less detailed than those he had previously been producing.  From time to time she would specifically instruct plaintiff how to alter the reports, including changing any negative balances that appeared.

Throughout his tenure, plaintiff apprised Riley of NRSD's deteriorating financial situation, but she did not convey that information to the Committee; in fact, she advised the Committee to exercise less scrutiny over NRSD's financials.  Plaintiff periodically asked Riley for a spending freeze in order to limit deficit spending.  In the spring of 2002, for example, he informed Riley that NRSD was facing a deficit of more than $1 million and requested a spending freeze for the remainder of the school year.  In response, Riley issued a written spending freeze as requested; however, she continued to authorize approximately $1 million in additional expenditures.  The Committee also authorized additional spending after the purported freeze.  Because of what he contends was an impending fiscal crisis, plaintiff attempted to refuse to authorize any additional spending requested by Riley.  As a result, there were some 150 purchase orders that he neither signed not processed.

Plaintiff detailed the growing multi-million dollar deficit to Riley and co-defendant Carlos Llanso, the School Committee Chair, in a closed meeting in June 2002.  That same day, he also explained NRSD's financial situation to the full Budget Subcommittee.  At that meeting, the

3

Subcommittee accused plaintiff of criminal activity. Neither Riley nor Llanso disputed those accusations.

Plaintiff submitted his resignation on June 20, 2002. He later e-mailed Riley, stating that he would be willing to rescind his resignation if she wanted to discuss NRSD finances and the accusations of criminal activity in detail. Riley accepted plaintiff's resignation by letter dated June 26, 2002. However, she also thanked plaintiff for his loyalty and service and requested that he stay in his position until September 13, 2002.[1] Plaintiff agreed to do so.

Sometime in early to mid-August, plaintiff took a vacation outside the country. While he was gone, Riley and co-defendant NRSD Treasurer Alice Roemer publicly claimed that they (and not plaintiff) had discovered the extensive budget deficit and placed blame solely on plaintiff. Riley suggested that she had no previous knowledge of NRSD's true financial state. Plaintiff contends he had provided precisely this information in his June meetings with the Superintendent, Committee Chair, and the Budget Subcommittee. Therefore, plaintiff contends, these parties, as well as other Committee members, had known the extent of the deficit and the reasons for it for months; accordingly, they knew that the statements of Riley and Roemer were false. Despite that

---

[1] The complaint is unclear as to whether the resignation, which was "accepted" on June 26, was effective that day or on September 13. The complaint states in relevant part:

> 30. Riley accepted Plaintiff's resignation on or about June 26, 2002 by letter. However, Riley also thanked the Plaintiff for his loyalty and service to the District and explained she did not wish for Plaintiff to immediately resign, requesting he stay his position until September 13, 2002.

> 31. Plaintiff accepted the offer of continued employment and agreed to stay at his position until September 13, 2002 as Riley had requested.

> 32. There was no further action or discussion about Plaintiff[']s employment situation until August of 2002.

knowledge, no Committee members requested that Riley refrain from "making her false and misleading statements to the public."

Plaintiff returned from vacation on August 16, 2002.  That day, he met with Riley, who asked him to return NRSD's property and told him it would be "in the best interest of the District and you if we ended our relationship effective immediately."  Riley offered to continue plaintiff's pay and compensation for a three-week period through September 13 and to write him a letter of recommendation.[2]  At the meeting, Riley also told plaintiff that NRSD had hired co-defendant MH&C, an independent accounting firm, to conduct an audit of NRSD's finances.  She asked plaintiff for his assistance in the investigation.  After the meeting, Riley directed the Assistant Superintendent to escort plaintiff from the property, which he did in view of the public.  On August 19, plaintiff spoke with accountants from MH&C regarding the audit.  Sometime in late August, he read an article in the *Worcester Telegram & Gazette* that NRSD had initiated a criminal investigation related to NRSD's finances.  According to the article, Riley and Roemer publicly claimed that they had spotted irregularities in the NRSD books eleven days earlier.  Plaintiff contends that Riley never informed him of the criminal investigation, despite having contacted government authorities herself in order to initiate it.  Neither Riley nor any other defendant offered to protect any of his statements form subsequent use in any potential criminal proceeding.

On August 30, NRSD again asked that plaintiff assist in MH&C's forensic audit.  Now aware of the pending criminal investigation, plaintiff requested that he receive any questions in

---

[2] She did not expressly tell him the status of his employment at that time; she later publicly stated he was on "administrative leave."

advance and that he be allowed to consult with an attorney at any subsequent meetings. Riley denied these requests. Neither Van Houten nor NRSD offered plaintiff a grant of immunity from the use of the information he gave in the forensic audit.

In a September 11, 2002 letter to plaintiff, Riley threatened to take disciplinary measures against plaintiff for his purported failure to cooperate with the MH&C. After plaintiff continued to refuse to answer questions, NRSD withheld both earned wages and unused vacation time from plaintiff. In addition, NRSD caused an electronic withdrawal of a portion of plaintiff's wages from his personal bank account. NRSD also filed a civil complaint in Superior Court attempting to compel Paquette's sworn testimony in the internal audit.

Around this time, Riley drafted a memorandum to the public in which she placed exclusive blame for the NRSD's financial crisis on plaintiff. At a series of public meetings with Committee members present, she expressed ignorance of the fiscal crisis prior to discovering it herself. Riley and Committee members made purportedly false statements that plaintiff "engaged in unethical accounting practices," "engaged in criminal activity," "forged signatures," and "was solely responsible for the financial crisis at Nashoba regional schools." Plaintiff contends that MH&C also made similar purportedly false accusations in various public meetings and statements to the press. In particular, John Sullivan, the accountant in charge of the forensic audit, blamed plaintiff for the financial crisis, and implied that plaintiff had engaged in conduct that was both unethical and criminal. According to plaintiff, Sullivan knew those statements were false because MH&C had entered a $60,000 contract with NRSD "to conduct the audit, make public statements and produce a report with the purpose of pointing the finger at Plaintiff."

Plaintiff wrote a letter to the District Attorney requesting that the defendants retract their

6

statements, which they refused to do.  Riley's employment contract was not renewed, and Llanso did not seek re-election as Committee chair.

## II.    Procedural Background

Various defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  NRSD, Riley, and the former School Committee members have moved to dismiss counts 1, 2, 8, 10, and 12.  NRSD has moved to dismiss counts 5 and 7.  MH&C has moved to dismiss counts 6, 7, and 12, or in the alternative for a more definite statement as to those counts under Rule 12(e).  The Court will address each count of the complaint in turn.

## III.    Analysis

### A.    Standard of Review

A motion to dismiss under Rule 12(b)(6) "serves only one purpose, and that is to test the legal sufficiency of the allegations, not of the evidence likely to be introduced at trial or on a motion for summary judgment."  *In re Digital Equipment Corp. Securities Litigation*, 601 F. Supp. 311, 313 n.2 (D. Mass. 1984).  A claim should be dismissed pursuant to Rule 12(b)(6) "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  In considering the merits of the motion, the Court must "assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theory of liability."  *Redondo-Borges v. United States Dept. of Housing and Urban Development*, 421 F.3d 1, 5 (1st Cir. 2005).

7

**B.     Count 1—§ 1983 Claim for Violation of Fifth Amendment Rights**

Count 1 alleges a claim under 42 U.S.C. § 1983 for violation of plaintiff's rights under the Fifth Amendment.  In essence, plaintiff contends that defendants violated his privilege against self-incrimination when they attempted to force him to cooperate with the MH&C audit without (1) informing him of the ongoing criminal investigation or (2) offering him immunity from the use of his statements in any subsequent criminal proceeding.  Defendant opposes the motion on the grounds that the Fifth Amendment privilege is not implicated because plaintiff was not criminally prosecuted and cannot demonstrate that defendants compelled him to make any incriminating statements.

The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964), provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  The privilege "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answer might incriminate him in future proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).

In *Garrity v. New Jersey*, the Supreme Court held that public employees who are compelled to make incriminating statements are protected from the use or derivative use of their statements in subsequent criminal proceedings.  385 U.S. 493, 500 (1967); *see Gulden v. McCorkle*, 680 F.2d 1070, 1073 (5th Cir. 1982); *Aguilera v. Baca*, 394 F. Supp. 2d 1203, 1219 (C.D. Cal. 2005); *see also Carney v. City of Springfield*, 403 Mass. 604, 610 (1988).  Moreover, a public employer may not compel an employee to waive the immunity granted in *Garrity* by

8

threatening loss of the employee's job. *See Gardner v. Broderick*, 392 U.S. 273, 279 (1968); *Uniformed Sanitation Men Ass'n, Inc., v. Comm. of Sanitation of New York*, 392 U.S. 280, 283-85 (1968).

However, a public employer retains the right to "secur[e] from public employees an accounting of their public trust." *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977). Accordingly, public employees "may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to surrender their constitutional immunity." *Id.* at 806; *accord Gardner*, 392 U.S. at 278.[3]

Plaintiff here contends that defendants attempted to compel him to make incriminating statements related to his job performance. However, plaintiff has made no allegation that defendants ever asked him to waive his immunity with respect to the direct or derivative use of his statements in a criminal proceeding, nor can the Court reasonably infer such a demand from the complaint. Accordingly, plaintiff has not alleged facts sufficient to constitute a Fifth Amendment violation.

Plaintiff attempts to avoid this conclusion by arguing, in essence, that defendants never *offered* him immunity for his statements. However, this argument ignores the fact that the use

---

[3] *See also Wiley v. Mayor and City Council of Baltimore*, 48 F.3d 773, 777 (4th Cir. 1995) (Powell, J.) (language of *Gardner* strongly indicates that "forcing a public employee to answer potentially incriminating job-related questions does not implicate the Fifth Amendment unless the employee is also compelled to waive his privilege"); *Lingler v. Fechko*, 312 F.3d 237, 239-40 (6th Cir. 2002) (no Fifth Amendment violation where officer not compelled to waive immunity and his statements were not used in criminal proceeding); *Hill v. Johnson*, 160 F.3d 469, 471 (8th Cir. 1998) (Fifth Amendment violated "only by the combined risks of both compelling the employee to answer incriminating questions and compelling the employee to waive immunity from the use of those answers"); *Singer v. Maine*, 49 F.3d 837, 846-47 (1st Cir. 1995); *Hester v. Milledgeville*, 777 F.2d 1492, 1496 (11th Cir. 1985); *Gulden v. McCorkle*, 680 F.2d 1070, 1074 (5th Cir. 1982) ("[I]t is the compelled answer in combination with the compelled waiver of immunity that creates the Hobson's choice for the employee."); *United States v. Indorato*, 628 F.2d 711, 717 (1st Cir. 1980) (no Fifth Amendment violation where defendant police officer was subject of internal investigation and (1) did not claim the privilege; (2) was not told he would be dismissed if he failed to answer the questions asked; (3) was not asked to sign a waiver of immunity).

immunity granted in *Garrity*—which is all that the Fifth Amendment requires, *see Kastigar v. United States*, 406 U.S. 454, 453 (1972)—is self-executing. *See, e.g., Wiley*, 48 F.3d at 777 n.7; *Gulden*, 680 F.2d at 1075 ("It is the very fact that the testimony was compelled which prevents its use in subsequent proceedings, not any affirmative tender of immunity."); *Hester*, 777 F.2d at 1496; *Aguilera*, 394 F. Supp. 2d at 1220-21. As such, the immunity is not defendants' to grant, but rather plaintiff's to waive. Thus, plaintiff's contention that the failure to *offer* immunity for his statements somehow violated his Fifth Amendment right is without merit.

Despite plaintiff's contentions to the contrary, the presence of an ongoing criminal investigation is not constitutionally significant in this context. "*Gardner* itself, which involved a police officer's testimony before a grand jury, indicates that the state may compel job-related testimony from an employee in the course of a criminal investigation" as long as the state does not make use of the statements in any criminal proceeding. *Wiley*, 48 F.3d at 777. There is no allegation here that any of the plaintiff's statements—let alone any compelled statements—were used in such a manner.

Plaintiff appears to make an alternative claim that defendants owed him a *warning* that because of his *Garrity* immunity, if he refused to answer questions on the ground that the answers may incriminate him, he could be discharged.[4] Such a requirement has been recognized only in the Seventh Circuit. *See, e.g.*, *Atwell v. Lisle Park District*, 286 F.3d 987, 990 (7th Cir. 2004) ("This rule is unique. It has been rejected in two circuits [i.e., the Eighth and Fifth], has been

---

[4] In opposing defendants' motion to dismiss, plaintiff states "Based on the Defendants' course of conduct, it can be inferred that Paquette had every reason to believe that any statements he made in the investigation would be provided to the criminal investigators and used against him in a subsequent criminal proceeding, and as such, the failure of the Defendants to provide him with immunity was a violation of his fifth-amendment rights."

expressly left open in two others [i.e., the Fourth and Tenth], and has been followed in none.").[5]

There is no reason to believe that such a rule applies in the First Circuit.   However, even assuming for present purposes that it does, its applicability to these facts is doubtful.  If such a duty to warn exists, it ripens only once the employee is asked specific questions.  *See, e.g.*, *Gulden*, 680 F.2d at 1075-76.  "The employee has no right to skip the interview merely because he has reason to think he'll be asked questions the answers to which might be incriminating." *Atwell*, 286 F.3d at 991.  Here, plaintiff decided not to meet with MH&C once he discovered the existence of the criminal investigation.  At that point, defendants attempted to compel his participation, and he, in essence, "skip[ped] the interview."  *Cf. Indorato*, 628 F.2d at 716 ("We do not think the subjective fears of defendant as to what might happen if he refused to answer his superior officers are sufficient to bring him within *Garrity*'s cloak of protection.").[6]

Accordingly, the Court finds the plaintiff has failed to allege facts sufficient to constitute a Fifth Amendment violation, and will therefore dismiss Count 1 as to all defendants.

**C.**    **Count 2—§ 1983 Claim for Violation of Due Process Clause**

Count 2, also brought under § 1983, alleges a deprivation of property and liberty without due process of law.  Defendants move to dismiss the due process claim on essentially three

---

[5] The Seventh Circuit has described its warning requirement as "anti-mousetrapping rule," explaining that "[u]ncounselled persons are much more likely to know about their 'Fifth Amendment' right than they are to know about an immunity that qualifies the right.  Asked to give answers to questions put to them in the course of an investigation of their arguably criminal conduct, they may instinctively 'take the Fifth' and by doing so unknowingly set themselves up to be fired without recourse." *Atwell*, 286 F.3d at 990.

[6] Even in the Seventh Circuit, the applicability of this rule has been questioned where the employee had counsel. *Atwell*, 286 F.3d at 991.  In the present case, it is unclear whether plaintiff was represented by counsel when defendants attempted to force him to answer questions.  In opposing defendants' motion to dismiss, plaintiff specifically states that defendants refused his "reasonable request that he either receive the questions in advance or be allowed to have his attorney present," suggesting that he was in fact represented at the time.

grounds:  (1) defendant had no property interest in his continued employment following his June

20, 2002 resignation; (2) the individual School Committee members are not proper defendants,

because they lacked the authority to dismiss plaintiff; and (3) plaintiff has failed to allege a prima

facie case of government liability under § 1983, precluding liability against NRSD.

### 1.    The Claim of a Property Interest in Continued Employment

A state actor may not discharge a public employee who possesses a property interest in

continued employment without affording him due process of law.  *Cleveland Bd. of Educ. v.

Loudermill*, 470 U.S. 532, 538 (1985).  A constitutionally protected property interest of this sort

exists when the employee has a "legally recognized expectation that [he] will retain [his]

position."  *See Santana v. Calderon*, 342 F.3d 18, 24 (1st Cir. 2003).  That interest may arise

from "a statute, a contract provision, or an officially sanctioned rule of the workplace."  *Id*. (citing

*Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972)).

Defendants argue, in substance, that when plaintiff voluntarily resigned, he surrendered

any legitimate expectation to continued employment and NRSD therefore need not have provided

him with due process.  *See Patterson v. Tortolano*, 359 F. Supp. 2d 13, 17 (D. Mass. 2005)

(citing *Walker v. Waltham Hous. Auth.*, 44 F.3d 1042, 1047 (1st Cir.1995)).

As noted earlier, the complaint is no model of clarity with respect to the circumstances of

plaintiff's resignation.  However, all that is necessary to survive a motion to dismiss under Rule

12(b)(6) is a reasonable *possibility* that plaintiff will be able to prove facts sufficient to support his

stated theory of liability.  Certainly the complaint can be read as alleging that Riley agreed to

accept plaintiff's resignation on June 26 and that the resignation would be effective as of

September 13.  Such a scenario, if supported by evidence, could amount to a legitimate

expectation, grounded in contract, in continued employment through September 13.[7]
Accordingly, the motion to dismiss Count 2 will not be granted on the basis of a lack of property interest.

### 2. The Due Process Claim against Former School Committee Members

Defendants contend that the former School Committee members cannot be liable for plaintiff's dismissal because by statute, only the Superintendent had the authority to dismiss plaintiff. *See* Mass. Gen. Laws ch. 71, § 42.[8]  Even if true—and plaintiff apparently concedes that it is—liability under § 1983 may nonetheless attach to the School Committee members.

Under Massachusetts law, the school committee for a regional school district "shall have the power to select and to terminate the superintendent," and "shall establish educational goals and policies for the schools" within the district.  Mass. Gen. Laws. ch. 71, § 37.  The superintendent is charged with, *inter alia,* "manag[ing] the system in a fashion consistent with state law and the policy determinations of [the] school committee."  Mass Gen. Laws. ch. 71, § 59.

It is well-established that liability under § 1983 may not be predicated on a theory of *respondeat superior* or vicarious liability.  *See Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 48

---

[7] To be clear, the Court is not deciding that there *was* a legitimate expectation, only that one may have been reasonably possible under those circumstances.  For that reason, the Court will not address the alternative argument offered by plaintiff that even if he was an at-will employee with no legitimate expectation of continued employment, defendants' actions violated his liberty interest under the Fourteenth Amendment.

[8] The statute provides in relevant part:

> In the case of an employee whose duties require him to be assigned to more than one school, and in the case of teachers who teach in more than one school, those persons shall be considered to be under the supervision of the superintendent for all decisions relating to dismissal or demotion for cause.

(1st Cir. 1999). Supervisors may be held liable only on the basis of their own acts or omissions. *Whitfield v. Meléndez-Rivera*, 431 F.3d 1, 14 (1st Cir. 2005). However, where a supervisor does not participate directly in the constitutional tort, he may nonetheless be liable for the acts of his subordinates where "(1) the behavior of such subordinates results in a constitutional violation and (2) the official's action or inaction was 'affirmative[ly] link[ed]' to that behavior in the sense that it could be characterized as 'supervisory encouragement, condonation, or acquiescence' or 'gross negligence amounting to deliberate indifference.'" *Lipsett v. Univ. of Puerto Rico,* 864 F.2d 881, 902 (1st Cir. 1988); *accord Whitfield*, 431 F.3d at 14 ("Supervisory liability can be grounded on either the supervisor's direct participation in the unconstitutional conduct, or through conduct that amounts to condonation or tacit authorization."). Of particular relevance is "whether the official was put on some kind of notice of the alleged violations, for one cannot make a deliberate or conscious choice to act or not to act unless confronted with a problem that requires the taking of affirmative steps." *Lipsett*, 864 F.2d at 902 (citation and internal quotation marks omitted).

In the present case, the complaint may be fairly read to allege that (1) the School Committee directly supervised the Superintendent; (2) the Committee was aware of the Superintendent's actions; and (3) the Committee condoned those actions. Accordingly, Count 2 states a claim of supervisory liability under § 1983 against the former School Committee members.

### 3.    The Due Process Claim against NRSD

To state a claim for municipal liability, plaintiff must allege that the municipality itself caused the constitutional violation at issue. Again, *respondeat superior* or vicarious liability will not attach under § 1983. *City of Canton v. Harris*, 489 U.S. 378, 387 (1989); *Monell v. Dept. of*

14

*Soc. Servs.*, 436 U.S. 658, 694-95 (1978).  Plaintiff must allege, either directly or inferentially,

both the existence of a policy or custom and a "direct causal link" between that policy and the

constitutional deprivation.  *Harris*, 489 U.S. at 385; *see also Monell*, 436 U.S. at 694 (policy

must be the "moving force [behind] the constitutional violation"); *Santiago*, 891 F.2d at 381-82.

      However, "a single decision can be a policy for *Monell* purposes, if it is made by the

official charged with the final responsibility for making it under local law."  *Harrington v. Almy*

977 F.2d 37, 45-46 (1st Cir. 1992) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84

(1986) (plurality)).  As the Supreme Court has explained, the purpose of *Monell*'s "official

policy" requirement is "to distinguish acts of the *municipality* from acts of *employees* of the

municipality, and thereby make clear that municipal liability is limited to action for which the

municipality is actually responsible."  *Pembaur*, 475 U.S. at 479 (emphasis in original).

      For the purposes of this motion to dismiss, the Court need not determine in detail the

respective policy functions of the Superintendent and School Committee.  *See id.* at 483 (policy-

making authority is a matter of state law).  If the final policy-making authority as to the relevant

employment decisions rests with the Superintendent, *see* Mass Gen. Laws. ch. 71, § 42, then her

actions could constitute municipal policy.  If, on the other hand, such authority rests with the

School Committee (i.e., if the Superintendent had discretion to hire and fire, but not policy-

making authority, *see Pembaur*, 475 U.S. at 483 n.12), its actions could constitute municipal

policy.  The complaint essentially alleges that the Committee and the Superintendent worked

closely and cooperatively with each other to violate plaintiff's rights.   Accordingly, the Court

cannot rule out the possibility that plaintiff will provide evidence that the Committee instructed

the Superintendent to dismiss plaintiff or sanctioned her actions.  Such Committee action could

constitute municipal "policy," whether or not the Committee had taken similar actions in the past or intended to do so in the future. *See Pembaur*, 475 U.S. at 480. Accordingly, the motion to dismiss Count 2 as to NRSD will be denied.

### D.    Count 5—Defamation (All Defendants Other Than MH&C)

Count 5 alleges defamation against NRSD and various individuals. Defendant NRSD has moved to dismiss that count on the grounds of sovereign immunity.

The Massachusetts Tort Claims Act ("MTCA") generally abrogates common-law sovereign immunity in order to permit private actions against public employers, including regional school districts such as defendant NRSD. *See* Mass Gen. Laws ch. 258, §§ 1, 2; *Doe v. Town of Blandford*, 402 Mass. 831, 833-35 (1988) (school district a "public employer" within the meaning § 2); *compare Desmarais v. Wachusett Regional School Dist.*, 360 Mass. 591, 593-594 (1971) (school district immune from suit for acts of employees prior to enactment of MTCA).

However, the Act preserves sovereign immunity for the intentional torts of government employees, including immunity for "any claim arising out of . . . intentional mental distress, libel, slander, [and] invasion of privacy." Mass Gen. Laws ch. 258, § 10(c). This exception thus precludes plaintiff's defamation claim against NRSD. *See Bouley v. City of Bedford*, 2005 WL 3287924, at *4 (D. Mass. Dec. 5, 2005); *Silva v. Zoning Bd. of Appeals of New Bedford*, 2001 WL 114687, at *1 (Mass. App. Ct. Feb. 9, 2001); *Kraft v. Roache*, 1993 WL 818556, at *3 (Mass. Super. Nov. 12, 1993). Count 5 will therefore be dismissed as to NRSD.

### E.    Count 6—Defamation (MH&C only)

Count 6 alleges defamation under state law against MH&C. MH&C has moved to dismiss

the count on the grounds that defamation claims must meet a "heightened pleading standard." Specifically, defendant contends plaintiff must specifically plead "*what* [MH&C] allegedly said . . . *when* the statement was made or *where* a copy, if any, of the statement can be located." That contention rests on a shaky foundation: a single sentence in a footnote of a fourteen-year-old First Circuit opinion that has been either implicitly abrogated or, at minimum, called in to question. *See Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 n.6 (1st Cir. 1992) ("In our view, a defendant is entitled to knowledge of the precise language challenged as defamatory.").[9]

Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." The Rule "[does] not require a claimant to set out in detail the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The Supreme Court has made clear that the Rule's "simplified pleading standard applies to all civil actions, with limited exceptions." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 513 (2002).

Based on what it characterized as "broad and unequivocal language" from the Supreme Court, the First Circuit has rejected a heightened pleading standard for civil rights actions. *See Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61, 66-67 & n.1 (1st Cir. 2004). Moreover, it has also expressly rejected the notion that a plaintiff must plead alleged defamatory language with particularity. *See Andersen*, 349 F.3d at 16-17 (expressly rejecting the Massachusetts pleading requirement that at least one sentence of the defamatory statements as

---

[9] As additional support for this proposition, MH&C cites Massachusetts pleading requirements for defamation. As the First Circuit has stated plainly, "under standard *Erie* doctrine, state pleading requirements, so far as they are concerned with the degree of detail to be alleged, are irrelevant in federal court even as to claims arising under state law." *Andersen v. Diorio*, 349 F.3d 8, 17 (1st Cir. 2003).

well as the approximate time and place of publication be pleaded with particularity); *accord Bleau v. Greater Lynn Mental Health & Retardation Ass'n*, 371 F. Supp. 2d 1, 1-2 (D. Mass. 2005) (rejecting its previous decision holding that defamation claims are subject to heightened pleading standards); *Lecrenski Bros., Inc. v. Johnson*, 312 F. Supp. 2d 117, 123 n.4 (D. Mass. 2004) (court had previously applied heightened pleading standard to defamation claims, but "[in] hindsight, that application was apparently wrong").   Accordingly, defendant's contention that plaintiff must plead his defamation claim with any heightened particularity is without merit.

That said, plaintiff's complaint, like all complaints, must, under Rule 8, "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47; *see* Fed. R. Civ. P. 8(a).  This is a relatively low threshold, and plaintiff has met it here.

Plaintiff asserts that Sullivan, as an agent of MH&C, made false statements "concerning Plaintiff[']s job performance and included comments that the Plaintiff was to blame for the District's financial crisis, statements that the Plaintiff engaged in unethical accounting practices, statements implicating that the Plaintiff had engaged in criminal activity, and statements implying that the Plaintiff was solely responsible for the financial crisis at the Nashoba Regional School District."  Moreover, plaintiff states that Sullivan made the statements at public meetings and to the press over the course of several months in the summer of 2002.

Such factual averments are enough to satisfy the minimal pleading requirements of Rule 8. *See, e.g.*, *Davidson v. Cao*, 211 F. Supp. 2d 264, 275-76 (D. Mass. 2002) (identifying the newspapers containing the false statements and implying an approximate time frame of a particular month satisfied Rule 8); *see also* 5 CHARLES ALAN WRIGHT AND ARTHUR R. MILLER,

FEDERAL PRACTICE AND PROCEDURE § 1245 at 429 (3d ed.2004) (although some courts have traditionally required more, "all the plaintiff technically is required to do is state a claim for which relief may be granted [that satisfies Rule 8], and many federal courts have demanded no more than that").  Accordingly, the motion of MH&C to dismiss Count 6 will be denied.

### F.    Count 7—Civil Conspiracy to Commit Defamation

Count 7 alleges a claim of civil conspiracy to commit defamation.  Defendants MH&C and NRSD have moved to dismiss the count.  MH&C contends, in essence, that plaintiff has failed to plead facts sufficient to support a civil conspiracy claim.  NRSD contends that as a municipality, it is not subject to suit for the intentional tort of conspiracy to commit defamation.  The Court will address each defendant's claim in turn.

### 1.    MH&C's Motion to Dismiss

Plaintiff purports to allege a claim of civil conspiracy under a theory of concerted action.[10] Under this cause of action, "there must be, first, a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." *Aetna Cas. Sur. Co.*, 43 F.3d at 1564; *see also* RESTATEMENT (SECOND) OF TORTS § 876(a) (1979).[11]  Alternatively, liability may attach

---

[10]  Massachusetts law recognizes two distinct theories of civil conspiracy.  *See Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563-64 (1st Cir. 1994); *Kurker v. Hill*, 44 Mass App. Ct. 184, 188 (1998).  The first, sometimes referred to as "true conspiracy," *see, e.g.*, *Flemming v. Dane*, 304 Mass. 46, 50 (1939), is a "very limited cause of action in Massachusetts," *Jurgens v. Abraham*, 616 F. Supp 1381, 1386 (D. Mass. 1985).  In essence, plaintiff must allege that "defendants, acting in unison, had 'some peculiar power of coercion' over plaintiff that they would not have had if acting independently." *Id.* (quoting *Fleming*, 304 Mass. at 50).  Under this theory of conspiracy, recovery is available if "there [is] no independent basis for imposing tort liability—where the wrong was in the particular combination of defendants rather than in the tortious nature of the underlying conduct."  *Kurker*, 44 Mass. App. Ct. at 188.

[11]  The Restatement describes this type of liability as follows:

For harm resulting to a third person from the tortious conduct of another, one is subject to

where one party provides "substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan." *Kurker*, 44 Mass. App. Ct. at 189; *see also* RESTATEMENT (SECOND) OF TORTS § 876(b) (1979). Plaintiff need not prove any power of coercion. *Kurker*, 44 Mass. App. Ct. at 188-89.

This type of conspiracy is not an independent tort—that is, there can be no liability unless another actor has committed an underlying tort. For example, MH&C cannot be liable for conspiracy to defame if no other party committed the tort of defamation. *See Johnson v. Brown & Williamson Tobacco Corp.*, 122 F. Supp. 2d 194, 208 (D. Mass. 2000) (no liability for conspiracy to commit fraud where plaintiff failed to plead facts sufficient to support underlying tort of fraud).

Plaintiff here has alleged the existence of an agreement between MH&C and other defendants to defame plaintiff (i.e., to wrongfully "point[] the finger at plaintiff") and tortious acts (i.e., defamatory statements, among other acts) made in furtherance of that agreement.[12] This, on

---

liability if he

    (a) does a tortious act in concert with the other or pursuant to a common design with him, or

    (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

    (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

RESTATEMENT (SECOND) OF TORTS § 876 (1979). The SJC has declined to "determined whether the principles of § 876 and the law of the Commonwealth are, in all respects, in complete accord." *Kyte v. Philip Morris, Inc.*, 408 Mass 162, 167 (1990).

[12] The factual allegations in the complaint underpinning the conspiracy claim are as follows. Plaintiff alleges that MH&C "entered into a written contract for [$60,000] to perform a fiscal audit of the School District's finances." (Compl. ¶ 100). MH&C was hired specifically to "conduct the audit, make public statements and produce a report with the purpose of pointing the finger at plaintiff." (Compl. ¶ 101). The Court must infer, for present purposes, that MH&C knew of this allegedly wrongful purpose when it entered the contract with the school district. The complaint then alleges that in furtherance of this agreement, "[t]he parties made . . . defamatory

its face, satisfies the pleading requirements of a civil conspiracy.  *See Aetna Cas. Sur. Co.*, 43 F.3d at 1564;  RESTATEMENT (SECOND) OF TORTS § 876(a).  MH&C's motion to dismiss Count 7 will therefore be denied.

### 2.   NRSD's Motion to Dismiss

As noted, plaintiff has alleged what is, in substance, a theory of vicarious liability for the intentional tort of defamation.  Thus, for the reasons described in dismissing Count 5 as to NRSD, the Court will also dismiss Count 7 as to NRSD.

### G.   Count 8—Massachusetts Civil Rights Act

Count 8 asserts a claim under the Massachusetts Civil Rights Act, Mass. Gen. Laws. ch. 12, §§ 11H and 11I.  The MCRA provides a right of action to any person whose exercise or enjoyment of rights secured by the federal or state constitution or laws has been interfered with by "threats, intimidation, or coercion."  *See Bally v. Northeastern Univ.*, 403 Mass. 713, 717 (1989).  Defendants have moved to dismiss on the grounds that plaintiff has not alleged interference by threats, intimidation, or coercion.

In order to satisfy that requirement, the plaintiff must typically demonstrate "an actual or potential physical confrontation accompanied by a threat of harm."  *Lecrenski Bros., Inc. v. Johnson*, 312 F. Supp. 2d 117, 122 (D. Mass. 2004) (internal quotation marks omitted); *see also Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 n.8; *Willitts v. Roman Catholic Archbishop of Boston*, 411 Mass. 202, 210 (1991).  However, that requirement is not

---

statements as a united front in several public meeting and to papers."  (Compl. ¶ 102).  Those alleged defamatory statements, as noted above, involved plaintiff's job performance, including "statements that the Plaintiff was to blame for the District's financial crisis, statements that the Plaintiff engaged in unethical accounting practices, statements inferring [*sic*] that the Plaintiff engaged in criminal activity, statements that the Plaintiff had forged signatures, and statements which implied that the Plaintiff was solely responsible for the financial crisis" at NRSD. (Compl. ¶ 102).

absolute; "in certain circumstances, economic coercion, standing alone, may be actionable under the [MCRA]." *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 648 (2003).[13]  Plaintiff concedes there was no physical confrontation, and therefore attempts to ground liability in economic coercion.

Plaintiff alleges as part of his MCRA claim that defendants violated his Fifth Amendment privilege against self-incrimination and his Fourteenth Amendment right to procedural due process.  The Court has previously determined that his Fifth Amendment claim is without merit; it cannot, therefore, serve as a predicate to an MCRA claim.  Accordingly, the Court will turn to the due process claims.

Plaintiff contends he had a property interest in both his continued employment and his earned wages and vacation, and that NRSD deprived him of that property interest without affording him constitutionally required procedural protections.  However, taking plaintiff's allegations as true, he was dismissed, if at all, on August 16, 2002.  Only after that date did defendants threaten him with discipline in the form of lost wages.  Thus, plaintiff has not alleged economic coercion aimed at interfering with any protected right; to the contrary, in this case, the alleged interference *preceded* anything that could otherwise constitute economic coercion.

The only potential claim remaining is the deprivation of his property interest in earned wages and vacation.  As discussed previously, to violate MCRA there must be, in addition to the

---

[13] The principal form of actionable economic coercion is actual or prospective breach of contract; indeed, claims involving such coercion have traditionally been treated as the narrow exception to the physical confrontation requirement.  *See Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 94-95 (1987); *Willitts*, 411 Mass. at 210; *Carvalho v. Town of Westport*, 140 F. Supp. 2d 95, 102 n.4 (D. Mass. 2001) (because plaintiff's claim "involve[d] coercion through threats of breach of contract," it "fit[] neatly into the limited exception" to the physical confrontation requirement).  It is unclear what, if any, other forms of economic coercion may give rise to liability under the MCRA.  *Buster*, 438 Mass. at 649 ("[W]e must await subsequent cases to determine more exactly the actionable bounds of economic coercion under the act . . . .").

deprivation itself, something akin to duress that causes the victim to relinquish her rights. *See Butler v. RMS Technologies, Inc.*, 741 F. Supp. 1008, 1011 (D. Mass. 1990). Unless there were some other form of economic coercion aimed at forcing plaintiff to give up earned wages and vacation, this claim cannot support liability under the MCRA. Plaintiff has not alleged any such coercion, and accordingly, Count 8 will be dismissed.

### H.    Count 9—Statutory Right to Privacy

Count 9 alleges a claim under the Massachusetts Right to Privacy statute, Mass. Gen. Law. ch. 214, § 1B. The statute provides that a person "shall have a right against unreasonable, substantial or serious interference with his privacy." Plaintiff alleges that his privacy right under this statute was violated when defendants revealed "personal information including his work evaluations, disciplinary documentation, promotion, demotion and termination information." Defendants move to dismiss on the grounds that NRSD, as a government entity, is not a proper defendant under the MTCA and that the information at issue is not sufficiently personal under the statute.

### 1.    Privacy Claims as to NRSD

As discussed previously, the limited waiver of governmental immunity under the MTCA does not apply to "any claims arising out of an intentional tort, including . . . invasion of privacy." Plaintiff's contention that this language is limited to claims alleging common law privacy violations lacks support either in the language of the statute or the case law interpreting it. *See, e.g.*, *MacLean v. Delinsky*, 407 Mass. 869, 878 n.6 (1990); *Bouley v. City of Bedford*, 2005 WL 3287924, at *4 (D. Mass. Dec. 5, 2005); *Fuentes v. Hampden County Sheriff's Dept.*, 2004 WL 1490434, at *16 (D. Mass. June 25, 2004). Accordingly, Count 9 will be dismissed as to

defendant NRSD.

### 2.    Privacy Claims as to All Other Defendants

To establish liability under ch. 214, § 1B, plaintiff must allege and prove that defendants disclosed facts of a "highly personal" nature about plaintiff without a legitimate reason for doing so.  *See Bratt v. Int'l Business Machines Corp.*, 392 Mass. 508, 517-18 (1984).  In the employment context, determining whether a particular disclosure is justified requires "balanc[ing] the employer's legitimate business interest in obtaining and publishing the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure."  *Gauthier v. Police Com'r of Boston*, 408 Mass. 335, 338 (1990) (emphasis and internal quotation marks omitted).  This balancing test applies to claims of both public and private employees.  *Id.*

Defendants argue that the information allegedly revealed was not of a highly personal nature, given the fact that plaintiff was a public employee and the financial crisis was a matter of public interest.  *See, e.g.*, *Martinez v. New England Med. Ctr. Hosps.*, 307 F. Supp. 2d 257, 267 (D. Mass. 2004) (statements limited to plaintiff's fitness for a position do not amount to unreasonable interference with plaintiff's privacy).  The Court, however, must balance the employer's interest in disclosure against the employee's interests in privacy on a case-by-case basis.  This requires a fuller understanding of the precise content of the disclosures and the context in which they were made.  Without being able to perform this balancing test, the Court cannot conclude that plaintiff will be unable to carry his burden at trial.  Accordingly, the motion to dismiss Count 9 will be denied as to the remaining defendants.

### I.    Count 10—Wrongful Termination in Violation of Public Policy

Count 10 asserts a claim for wrongful termination in violation of public policy against

24

NRSD, Riley, and the former School Committee members.  Plaintiff first contends he was fired

for asserting his Fifth Amendment privilege.  The Fifth Amendment claim, as discussed above, is

without merit.  He also alleges, in substance, that he was fired for "whistle-blowing"—reporting

the fiscal crisis to his supervisors.  Defendants contend that the complaint fails to establish a

wrongful termination claim.[14]

Generally, an employer may terminate an at-will employee "at any time for any reason, or

no reason at all."  *Upton v. JWP Businessland*, 425 Mass. 756, 757 (1997).  A limited exception

to this rule exists where the employee was fired "for a reason that violates a clearly established

public policy."  *Id.*  Generally, "[r]edress is available for employees who are terminated for

asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the

law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g.,

committing perjury)."  *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404

Mass. 145, 149-150 (1989).

Beyond the three categories of protected acts identified in *Smith-Pfeffer*, there are

circumstances in which an at-will employee may not be terminated for "performing important

public deeds, even though the law does not absolutely require the performance of such a deed."

*Flesner v. Technical Comm. Corp.*, 410 Mass 805, 810-811 (1991).  The SJC specifically

identified whistle-blowing as an example.  *Id*. at 811 n.3 (collecting cases); *see also Shea v.

Emmanuel Coll.*, 425 Mass. 761, 762-63 (1997) (termination for reporting unlawful conduct to

management violated public policy; court eliminated previous distinction between internal

---

[14] Defendants contend the claim should be dismissed as to the former Committee members because they could not have terminated plaintiff as a matter of law.  As discussed previously, the Court cannot at this stage of litigation preclude the possibility that the Committee members were responsible for the firing of plaintiff.

complaint and complaint to external authorities).  Plaintiff's claim, construed liberally, appears to fall within this exception.[15]  Riley's request that plaintiff remain Director of Finance and Operations for a period after he revealed the financial crisis does not necessarily preclude his whistle-blower claim.  Accordingly the motion to dismiss Count 10 will be denied.

### J.    Count 12–Intentional Infliction of Emotional Distress

Count 12 alleges intentional infliction of emotional distress.  Defendants MH&C, Riley, and the former School Committee members have moved to dismiss Count 12 on the grounds that the conduct alleged in the complaint, even if true, is not sufficiently extreme or outrageous to state a claim for intentional infliction of emotional distress.  NRSD has moved to dismiss the claim on the grounds that it is immune from suit under the MTCA.

In order to state a cognizable claim for intentional infliction of emotional distress, a plaintiff must allege that (1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous; (3) the conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe and of a nature that no reasonable person could be expected to endure it.  *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976).  The SJC has defined

---

[15] The Massachusetts legislature has specifically protected public employees from retaliation for whistle-blowing.  Under Mass. Gen. Laws ch. 149, § 185, a public employer, including a regional school district, "shall not take any retaliatory action against an employee because the employee" discloses to a supervisor any "activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law."  The statute also prohibits retaliation for objecting to or refusing to participate in any such activity, policy or practice.  Mass. Gen Laws ch. 149, § 185(b)(3).

Significantly for present purposes, the legislature provided that nothing in the law "shall be deemed to diminish the rights, privileges or remedies of any employee under any other federal or state law or regulation . . . ; except that the institution of a private action [under the statute] shall be deemed a waiver by the plaintiff of the rights and remedies available to him, for the actions of the employer, under any other contract, . . . state law, rule or regulation, or under the common law."  *Id*. at § 185(f).

"extreme and outrageous" conduct as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987) (internal quotation marks omitted). The complaint need not allege facts that must, as a matter of law, constitute extreme and outrageous conduct; it is sufficient that "reasonable people could differ on whether the conduct is 'extreme and outrageous.'" *Brown v. Nutter, McClennen & Fish*, 45 Mass. App. Ct. 212, 219 (1998) (quoting *Agis*, 371 Mass. at 145-146); *see also Vittands v. Sudduth*, 49 Mass. App. Ct. 401, 410 (2000).

### 1.    MH&C's Motion to Dismiss

Plaintiff has alleged that MH&C defamed him by falsely blaming him for NRSD's financial situation. In short, plaintiff has alleged a course of conduct by MH&C in which the company repeatedly made statements that it knew were false in order to shift blame away from Riley and the School Committee. Those statements allegedly attacked plaintiff's integrity and competence, and were disseminated widely through public meetings and the press. Whether plaintiff can prove those allegations is not at issue here; the Court must treat them as true and must indulge all reasonable inferences therefrom that fit the plaintiff's stated theory of liability. *Redondo-Borges*, 421 F.3d at 5.

Although Massachusetts law sets a high bar for emotional distress claims, defamatory statements, particularly in a professional context, can provide grounds for recovery. *See, e.g.*, *Tech Plus, Inc. v. Ansel*, 59 Mass. App. Ct. 23, 26 (2003) (in order to win business client from plaintiff, defendant made statements to client that plaintiff was anti-Semitic and prejudiced against homosexuals; conduct was sufficient to warrant jury finding of intentional infliction of emotional

distress).[16]   Moreover, a viable claim may involve actions that would not be considered

outrageous when viewed in isolation, but may be so when viewed in totality.  *See, e.g.*, *Boyle v.*

*Wenk*, 378 Mass. 592, 595 ( 1979) ("Repeated harassment . . . may compound the outrageousness

of incidents which, taken individually, might not be sufficiently extreme to warrant liability for

infliction of emotional distress.").

Given these standards, the Court finds that the complaint sufficiently alleges "extreme and

outrageous" conduct against MH&C under Massachusetts law.  Accordingly, MH&C's motion to

dismiss Count 12 will be denied.

## 2.    Riley and School Committee Members

The preceding analysis applies with equal force to Riley and the former School Committee

members.  Indeed, plaintiff alleges conduct by these defendants that, if anything, provides a firmer

foundation for liability.  The motion to dismiss Count 12 will therefore be denied as to defendants

Riley and all former members of the School Committee.

## 3.    NRSD

As discussed with respect to Count 5, § 10(c) of the MTCA precludes claims against

NRSD for the intentional torts of its employees, and specifically cites "intentional mental distress"

---

[16] The SJC has stated that liability may not be predicated upon

"mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," nor even
is it enough "that the defendant has acted with an intent which is tortious or even criminal, or
that he has intended to inflict emotional distress, or even that his conduct has been characterized
by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for
another tort"; rather, "[l]iability has been found only where the conduct has been so outrageous in
character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be
regarded as atrocious, and utterly intolerable in a civilized community."

*Foley.* 400 Mass. at 99 (quoting RESTATEMENT (SECOND) OF TORTS § 46, comment d (1965)).

as an example.  Mass. Gen. Laws ch. 258, § 10(c); *see also Tilton v. Town of Franklin*,  24 Mass. App. Ct. 110, 112-113 (1987).  Accordingly, Count 12 will be dismissed as to NRSD.

### K.    MH&C's Motion for a More Definite Statement

Defendant MH&C has moved in the alternative under Fed. R. Civ. P. 12(e) for a more definite statement as to Counts 6, 7, and 12.  Such a motion may be granted when the complaint is "so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."  Fed. R. Civ. P. 12(e).  Thus, these motions are "designed to strike at unintelligibility, rather than at lack of detail in the complaint."  *Cox v. Maine Maritime Academy*, 122 F.R.D. 115, 116 (D. Me. 1998); *Hilchey v. City of Haverhill*, 233 F.R.D. 67, 69 (D. Mass. 2005).  Although the complaint is no model of clarity, it satisfies the minimal pleading requirements of Rule 8 and provides MH&C with sufficient notice to form a responsive pleading.  Additional facts that defendant seeks, such as the precise defamatory language allegedly employed, may be sought in discovery.  *See Cox*, 122 F.R.D. at 116.  Accordingly, the motion will be denied.

### IV.    Conclusion

For the reasons set forth the preceding memorandum:

1.    Defendants' Motion to Dismiss is GRANTED as to Counts 1 and 8;

2.    Defendant Nashoba Regional School District's Motion to Dismiss is GRANTED as to Counts 5, 7, 9, and 12 ;

3.    Defendants' Motions to Dismiss are otherwise DENIED; and

4.    Defendant Melanson Heath & Company's Motion for a More Definite Statement is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: March 30, 2006